# Adams v. Harper

C.P. of Monroe County, no. 32 D.R. 1991.

*Robin A. Spishock,* for plaintiff.
*Donald G. Scheck,* for defendant.

MILLER, *J.,* April 12, 1996—On May 14, 1993, plaintiff Christopher Adams filed a complaint seeking custody of the parties' two children, Christopher Adams Jr. (C.J.), born October 1, 1986, and Faith Adams, born May 21, 1990. Following this, the master made a recommendation which became an order of court on June 24, 1993. The order granted shared legal and physical custody of the children to the parents, and awarded primary custody to Ms. Harper. The instant action stems from a petition for modification filed by Mr. Adams.

Mother and Father met in 1984, when she was 16 and he was 26. They lived together continuously from 1986 through 1990, and then sporadically from 1990 until 1992. They never married. In early 1993, Mother began living with Yusef Aziz, her sister's husband. Mr. Aziz and Ms. Harper's sister have since divorced. Presently, Mother and Mr. Aziz reside in a mobile home located on property owned by Ms. Harper's mother in an area of Marshalls Creek, Monroe County known as Harper Hill. Numerous members of the Harper clan and their significant others, including Edna Aziz, Yusef's former wife, live in various mobile homes close to each other on this property. At the time of the home studies, residents of the three-bedroom trailer included Ms. Harper, Mr. Aziz, C.J., Faith, and three of Mr. Aziz's children from his marriage to Edna, Dirul (age 13), Aneesha (age 14), and Yusef (age 17). Life in the trailer is crowded, so much so that C.J. was sleeping in the same room as Faith and Aneesha. C.J. was moved into the bedroom with his two male cousins only after the social worker conducting the study suggested he be moved.

C.J. has been diagnosed with Attention Deficit Disorder (ADD) and has always had trouble in school.

He is in the third grade and has been suspended repeatedly for violent, physical outbursts at school. C.J. impressed us in chambers as a big, strong, good-looking, smooth-talking youngster with a natural ability to charm others into giving him exactly what he wants. Faith is a pretty, little girl who let her brother do most of the talking. She is described as a quiet, well-behaved kindergartener and seems to be overlooked by both parents in their struggles to deal with C.J.'s outbursts.

A custody dispute must be resolved in favor of the best interests of the children. In cases involving custody of minor children, the children's physical, intellectual, moral and spiritual well-being are the paramount concerns of the court. *Gerber v. Gerber,* 337 Pa. Super. 580, 487 A.2d 413 (1985). The simplicity of this guiding rule belies the difficulty of its application, for there is no easy test to determine a child's best interest. Just as each child is an individual, each case is individual and must be decided only upon a sensitive evaluation of the facts.

Both Mother and Father recognize that C.J. is a difficult child and that he requires extra attention and care. C.J.'s diagnosis as an ADD child serves to make the task of parenting him all the more challenging. Doctor John Abbruzzese, a court-appointed child psychologist, evaluated C.J. and testified that consistency, security and stability in his life and environment will be most beneficial as it is supplemented by medication and supportive therapeutic intervention.

At the urging of his Father, C.J. has been taking the prescription drug Ritalin. To some extent, Ritalin has been helping C.J. control the violent outbursts that accompany ADD. Although both parents were concerned about C.J.'s diagnosis, it was Mr. Adams that insisted that he be examined and treated by both medication and counseling. Ms. Harper, on the other hand, seemed reluctant to acknowledge the problem and is

not completely reliable in making C.J. receive his current daily dosage of Ritalin.

Ms. Harper called witnesses from Resica Elementary where C.J. is currently in third grade. Guidance Counselor Evelyn Shook testified to the vast number of special services programs available at Resica tailor-made to assist children like C.J. in trying to overcome ADD and other behavioral problems. C.J. receives special help in his class work in a place called the "resource room." He is also eligible for "Wraparound 50" services with a behavioral modification services specialist. C.J. is also enrolled in a behavior modification plan. Under the plan, if C.J. becomes aggressive, a counselor will remove him to a different room for a "time out." Once removed, the counselor will speak with C.J. "to select alternatives to the behavior he displayed." Mrs. Shook testified that this program is extremely important for C.J. who displays increasingly "oppositional defiance towards adults." We had great difficulty in determining exactly what this program is able to accomplish. On one occasion this school year, when C.J. became aggressive and hit another student, Resica automatically suspended C.J. When Mrs. Shook was asked why C.J. was not removed in order to have him speak with his counselor as is provided under his behavioral modification plan, she testified that striking another student requires an automatic suspension under school policy. The special services do not apply in such a case.

Gregory Naudascher, the principal of Resica Elementary, testified that although C.J.'s behavior has improved this year, he becomes very angry at times. On one occasion, C.J.'s Ritalin prescription was to be increased from 10 to 15 milligrams. C.J. refused to take the increased dosage and refused to leave his desk. During this incident, the principal, the school psychologist and the behavior modification specialist tried unsuccessfully to get C.J. out of his desk and to the "time

out" area. Ultimately, Mr. Adams was called and came to the school. With his father's firm intervention, C.J. was physically removed from his seat by his father and taken out of the classroom. Principal Naudascher admitted that nothing could be done for C.J. until his father got to the school. C.J. is not receiving any special attention at Resica that he could not receive in the Pocono Mountain or any other school district.

The main focus of the testimony of both parents was C.J. Ms. Harper's home study commented "Faith presents no behavioral problems" and that sums up her story neatly. Because she is not nearly the challenge her brother is to raise, it appears that Faith has often been overlooked by both parents. Faith does receive a great deal of attention and support from C.J. When we spoke to the children in chambers, they entered holding hands. They seem to take care of each other. As Doctor Abbruzzese described in his report of C.J., "His negative comments toward Faith are not supported by his care-taking reactions to her." We do not see it in the best interest of either child that they be separated.

As reported in the home study and uncontradicted by Ms. Harper during the hearings, Mr. Adams alleged that when Ms. Harper was a child, she was a victim of incest, as well as a victim of sexual abuse by Mr. Aziz. Understandably, he is concerned about the well-being of his daughter living with Mr. Aziz. Further, there is concern regarding a brother of Ms. Harper who is living at Harper Hill after serving a five-year sentence for rape. He also voiced his concerns about the conduct of the Aziz children.

Our appellate courts have consistently emphasized that we conduct a penetrating and comprehensive inquiry in custody matters. *Com. ex rel. Bowers v. Widrig,* 318 Pa. Super. 198, 464 A.2d 1299 (1983).

Pursuant to 42 Pa.C.S. §6307, this court is permitted to inspect files and records of juvenile court. This we

have done in reference to the Aziz children and have found Mr. Adams' concerns to be well-founded. See also, *In re Kriner,* 43 D.&C.3d 559 (1985).

Mr. Adams impressed us as a stable and caring parent capable of providing his children with the care and guidance necessary for them to grow. We find that Ms. Harper does care for the children but cannot provide a safe and stable environment for them under the current situation.

As a concluding matter, the court notes that it is familiar with the area of Monroe County colloquially known as "Harper Hill." We are acquainted with several members of the Harper clan, as they are frequently before the court on a variety of matters. In the past, we have noticed that when one Harper is before the court, other members of the family are present as a show of support. In the two hearings convened for this custody matter, there were no Harpers present. For the foregoing reasons, we enter the following order.

## ORDER

And now, April 12, 1996, it is ordered as follows:

(1) Christopher Adams and Lillie Mae Harper, parents of Christopher Adams Jr., (C.J.), and Faith Adams, shall have shared legal custody of their children, together with all duties, rights and obligations inherent therewith, including but not limited to the responsibility of the parents to communicate by and between themselves prior to making any major decisions concerning the health, safety, welfare or education of the children.

(2) The parents shall have shared physical custody of C.J. and Faith with Father having primary physical custody subject to Mother's periods of partial physical custody on alternate weekends from Friday after school through Sunday at 7 p.m. Mother shall also have partial physical custody each Wednesday after school until 7:30 p.m.

(3) Mother shall have primary physical custody for six weeks throughout the summer. Mother shall give Father at least 45 days notice of the weeks she intends to elect.

(4) The parents shall alternate the holidays of Christmas Eve, Christmas Day, New Year's Eve, New Year's Day, Fourth of July, Easter and Thanksgiving. All holidays which occur on a Monday, including but not limited to Martin Luther King Jr.'s Birthday, President's Day, Labor Day and Memorial Day, shall be an extension of physical custody to the parent having custody that weekend. Custody for the Christmas holiday shall be divided from noon on Christmas Eve through noon on Christmas Day, and noon on Christmas Day through 7:30 p.m. December 28. The Easter holiday shall be divided from noon on the Saturday before Easter through noon on Easter Sunday, and noon on Easter Sunday through noon on Easter Monday unless the Monday custody interferes with attendance at school. Physical custody for the Thanksgiving holiday shall begin at 5 p.m. the Wednesday prior to Thanksgiving through 7 p.m. on Thanksgiving Day. Physical custody on the New Year's holiday shall begin at noon on December 31 through noon on January 1, and noon on January 1 through noon on January 2, unless the January 2 date interferes with school attendance at which time physical custody shall return to Father at 5 p.m. on New Year's Day.

(5) The children shall spend Mother's Day with Mother and Father's Day with Father.

(6) Mother shall pick up the children at Father's home at the beginning of her periods of partial custody, and Father shall pick up the children at Mother's home for his periods of custody.

(7) Both parents shall have reasonable telephone access to their children when not in their physical custody, and the children should be encouraged to telephone the non-custodial parent by the custodial parent on a regular basis.